Andrew G. Gunem (SBN: 354042)
Raina C. Borrelli (*pro hac vice* forthcoming)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
agunem@straussborrelli.com
raina@straussborrelli.com

*Attorneys for Representative Plaintiffs and the Proposed Class*
*- Additional counsel on last page -*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| PEARL WOLF *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SERVICEAIDE, INC.,<br><br>Defendant. | 5:25-cv-04251-PCP<br><br>Consolidated with:<br>Case No. 5:25-cv-04256-PCP<br>Case No. 5:25-cv-04260-PCP<br>Case No. 5:25-cv-04265-PCP<br>Case No. 5:25-cv-04272-PCP<br>Case No. 5:25-cv-04278-PCP<br>Case No. 5:25-cv-04280-PCP<br>Case No. 5:25-cv-04295-PCP<br>Case No. 5:25-cv-04327-PCP<br>Case No. 5:25-cv-04440-PCP<br>Case No. 5:25-cv-04974-PCP |
| This Document Relates to:<br>All Actions | **CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>1. **NEGLIGENCE**<br>2. **BREACH OF IMPLIED CONTRACT**<br>3. **UNJUST ENRICHMENT**<br>4. **INVASION OF PRIVACY**<br>5. **VIOLATION OF THE UCL, Cal. Bus. & Prof. Code § 17200, *et seq.***<br>6. **DECLARATORY JUDGMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Nancy Balzer, Patricia Barclay, Michelle Fix, Jason Gordon, David A. Hoover, Shawnte Monique McDowell, Donna M. Orlando-Martin, Grace Sherk, Chloe Wright, Roy Everett Yax, Dawn Pendrak, Michael Gurr and Lee Holdsworth (collectively, "Plaintiffs"), individually and on behalf of the Class defined below of similarly situated persons, allege the following against Defendant Serviceaide, Inc. ("Serviceaide" or "Defendant"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by counsel as to all other matters.

## **INTRODUCTION**

1.      This action arises from Defendant's failure to secure the personally identifiable information ("PII")[1] and protected health information ("PHI")[2] (collectively, "Private Information") of Plaintiffs and the members of the proposed Class.

2.      Between September 19, 2024, and November 5, 2024, certain patient information within Serviceaide's Catholic Health Elasticsearch database was made publicly available (hereafter, the "Data Breach" or "Breach").

3.      Defendant did not learn that the information was publicly disclosed until November 15, 2024. Following an internal investigation, Defendant learned that from September 19, 2024 to

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, Dep't for Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

-2-
CONSOLIDATED CLASS ACTION COMPLAINT (Case No. 5:25-cv-04251-PCP)

November 15, 2024, one of Defendant's clients, Catholic Health System, Inc's ("Catholic Health"), current and former patients' highly personal information was disclosed and publicized. The impacted data included: names, Social Security numbers, dates of birth, medical record numbers, patient account numbers, medical/health information, health insurance information, prescription/treatment information, clinical information, provider names, provider location, and email/usernames and passwords (collectively, "Private Information").

4.     On or around May 9, 2025, over seven months after the Data Breach began, Defendant finally started to notify some Class Members about the Data Breach ("Breach Notice"). The Breach Notice is attached as Exhibit A.

5.     The Breach Notice states that the Private Information was "inadvertently made publicly available." Due to intentionally obfuscating language, it is unclear how the Data Breach occurred or how long Plaintiffs' and the Class's most sensitive information was accessible to unauthorized third parties.

6.     Defendant took at least seven months before informing Class Members even though Plaintiffs and thousands of Class Members had their most sensitive personal information accessed and abused, causing them to suffer ascertainable losses in the form of identity theft and fraud, the loss of the benefit of their bargain, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

7.     Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to disclose when the Data Breach occurred, how many people were impacted, how the Breach happened, and why it took Defendant until May 2025 to begin notifying victims that their highly sensitive Private Information was publicized.

8.     Defendant's failure to timely detect and report the Data Breach made its customers' patients and employees vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their Private Information.

9.     Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII and PHI misuse.

10.     In failing to adequately protect Plaintiffs' and the Class's Private Information, failing to adequately notify them about the Breach, and by obfuscating the nature of the Breach, Defendant violated state and federal law and harmed an unknown number of its customers' current and former patients, and employees.

11.     Plaintiffs and members of the proposed Class are victims of Defendant's negligence and inadequate cyber security measures. Plaintiffs and Class Members would not have provided their valuable Private Information had they known that Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

12.     Instead, Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement reasonable measures to safeguard its client's current and former patients' Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendant's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

13.     As a result of the Data Breach, which Defendant failed to prevent, the Private Information of its client's patients, including Plaintiffs and the proposed Class Members, was stolen.

14.     As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) illegal sales of the compromised Private Information; (f) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (g) identity

theft insurance costs; (h) out-of-pocket costs incurred due to actual identity theft; (i) credit freezes/unfreezes; (j) expense and time spent on initiating fraud alerts and contacting third parties; (k) decreased credit scores; (l) lost work time; and (m) anxiety, annoyance, and nuisance; (n) continued risk to their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

15.     Accordingly, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, bring this lawsuit seeking injunctive relief, damages, and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in Defendant's possession.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs. There are at least 100 putative Class Members and members of the proposed Class are citizens of states different from Defendant.

17.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District and does substantial business in this District.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

19.     Plaintiff Nancy Balzer is, and at all relevant times has been, a resident and citizen of the State of New York where she intends to remain.

20.     Plaintiff Patricia Barclay is, and at all relevant times has been, a resident and citizen of the State of New York where she intends to remain.

21.     Plaintiff Michelle Fix is, and at all relevant times has been, a resident and citizen of the State of New York where she intends to remain.

22.     Plaintiff Jason Gordon is, and at all relevant times has been, a resident and citizen

CONSOLIDATED CLASS ACTION COMPLAINT (Case No. 5:25-cv-04251-PCP)

of the State of Arkansas where he intends to remain.

23. Plaintiff Michael Gurr is, and at all relevant times has been, a resident and citizen of the State of New York where he intends to remain.

24. Plaintiff David A. Hoover is, and at all relevant times has been, a resident and citizen of the State of New York where he intends to remain.

25. Plaintiff Shawnte Monique McDowell is, and at all relevant times has been, a resident and citizen of the State of New York, where she intends to remain.

26. Plaintiff Donna M. Orlando-Martin is, and at all relevant times has been, a resident and citizen of the State of New York where she intends to remain.

27. Plaintiff Dawn Pendrak is, and at all relevant times has been, a resident and citizen of the State of New York, where she intends to remain.

28. Plaintiff Grace Sherk is, and at all relevant times has been, a resident and citizen of the State of New York where she intends to remain.

29. Plaintiff Chloe Wright is, and at all relevant times has been, a resident and citizen of the State of New York where she intends to remain.

30. Plaintiff Roy Everett Yax is, and at all relevant times has been, a resident and citizen of the State of New York where he intends to remain.

31. Defendant, Serviceaide, Inc., is a Delaware corporation with its headquarters and principal place of business located at 2445 Augustine Drive, Suite 150, Santa Clara, California 95054.

## FACTUAL ALLEGATIONS

### A. *Serviceaide and Catholic Health System, Inc.*

32. Defendant Serviceaide is a company that provides its clients with "AI-powered solutions" to "streamline workflows, boost productivity, and enhance service delivery."[3]

---

[3] *About Us*, SERVICEAIDE, https://www.serviceaide.com/about-us (last visited August 14, 2025).

Serviceaide states it employs "advanced technology" to enable "informed decision-making and exceptional service delivery."[4]

33.     Catholic Health is a Buffalo, New York based non-profit healthcare system that provides care to Western New Yorkers across a network of hospitals, nursing homes, home care agencies, and physician practices.[5]

34.     According to Defendant's Breach Notice, Catholic Health is a client of Serviceaide.

35.     On information on belief, Defendant provides services to additional entities across the country.[6]

36.     As part of its business of providing healthcare, Catholic Health receives and maintains the Private Information of thousands of its current and former patients.

37.     As part of its business operations, Serviceaide receives and maintains the Private Information of thousands of Catholic Health's current and former patients.

38.     In collecting and maintaining Private Information from its clients, Defendant agreed it would safeguard the data in accordance with state and federal law. After all, Plaintiffs and Class Members themselves take reasonable steps to secure their own Private Information.

39.     Serviceaide promises to safeguard the Private Information it collects, declaring in its "Customer Privacy Statement" that:

> At Serviceaide, we respect the privacy of our customers, business partners, event attendees, job applicants and Site visitors. We are committed to providing a best-in-class experience, while ensuring the privacy and security of your data. The Company is committed to protecting the privacy of individuals who visit the Site and interact with our Services[.] [7]

---

[4] *Id.*

[5] *About Us*, CATHOLIC HEALTH, https://www.chsbuffalo.org/ (last visited August 14, 2025).

[6] *Success Stories*, SERVICEAIDE, https://www.serviceaide.com/resources/success-stories (last visited August 14, 2025).

[7] *Customer Privacy Statement*, SERVICEAIDE, https://www.serviceaide.com/customer-privacy-statement#:~:text=We%20have%20disclosed%20your%20personal,servicing%20accounts%2C%20providing%20customer%20service (last visited August 14, 2025).

38.     Despite recognizing their duty to do so, on information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect the Private Information in its care or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As a result, Defendant left significant vulnerabilities in its systems for the breach and publication of its customers', including Catholic Health's, patients' Private Information.

**B.  *The Data Breach.***

39.     Plaintiffs are current/former patients and employees of Catholic Health and Data Breach victims. As a condition of treatment with Catholic Health, Plaintiffs provided Catholic Health with their Private Information. On information and belief, Catholic Health then provided access to that Private Information to Serviceaide, who used Plaintiffs' Private Information to facilitate its business operations.

40.     On information and belief, Defendant collects and maintains the Private Information of its clients' current and former patients and employees in its computer systems.

41.     In collecting and maintaining Private Information, Defendant implicitly agrees that it will safeguard the data using reasonable means according to state and federal law.

42.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the Private Information it was maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

43.     The Breach Notice states:

**What Happened?**
On November 15, 2024, Serviceaide learned that certain information within its Catholic Health Elasticsearch database was inadvertently made publicly available. In response, we promptly took steps to secure Catholic Health's Elasticsearch database and initiated an investigation into the nature and scope of the event. The investigation determined that between September 19, 2024 and November 5, 2024, certain patient information was publicly available.
**What Information Was Involved?**
While we have no indication of identity theft or fraud in relation to this incident, the review determined the universe of potential information present in the impacted data may include name, Social Security number, date of birth, medical

record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password.

44. In other words, Defendant's cyber and data security systems were so completely inadequate that they permitted Plaintiffs' and the Class's highly sensitive Private Information to become "publicly available" for *47 days*.

45. Defendant did not notify Data Breach victims of the publication of their Private Information until on or around May 9, 2025—*seven months* after the Breach was discovered.

46. Due to the intentionally obfuscating language in Defendant's Breach Notice, it is unknown to Plaintiffs how Plaintiffs' and the Class's Private Information was "inadvertently made publicly available" or what Defendant means when it states the Private Information was "publicly available."

47. Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class's Private Information for use by fraudsters and sale on the dark web.

## C. *Defendant Failed to Comply with Regulatory Requirements and Standards.*

48. Federal and state regulators have established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and employees. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

49. For example, at least 24 states have enacted laws addressing data security practices that require businesses that own, license, or maintain Private Information about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect Private Information from unauthorized access.

50. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches,

and routers; monitoring and protecting of physical security systems; protecting against any possible communication system; and training staff regarding critical points.[8]

51.     The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[9]

52.     Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[10]

53.     The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

54.     The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[11]

55.     The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or

---

[8] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security.

[9] *Start With Security*, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[10] *Protecting     Personal     Information:     A     Guide     for     Business*,     FTC, https://www.ftc.gov/system/files/          documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[11] *Id.*

practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

56. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

57. Defendant's failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

58. Furthermore, Defendant is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the Security Rule set nationwide standards for protecting health information, including health information stored electronically.

59. The Security Rule requires Defendant to do the following:

   a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d. Ensure compliance by its workforce.[12]

60. Pursuant to HIPAA's mandate that Defendant follows "applicable standards, implementation specifications, and requirements . . . with respect to electronic protected health information," 45 C.F.R. § 164.302, Defendant was required to, at minimum, "review and modify the security measures implemented . . . as needed to continue provision of reasonable and

---

[12] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html.

CONSOLIDATED CLASS ACTION COMPLAINT (Case No. 5:25-cv-04251-PCP)

appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

61.     Defendant is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

62.     Both HIPAA and HITECH obligate Defendant to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

63.     As alleged in this Complaint, Defendant has failed to comply with HIPAA and HITECH. It has failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure the confidentiality and protection of PHI.

**D.  *Defendant Failed to Comply with Industry Practices.***

64.     Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[13] All organizations collecting and handling Private Information, such as Defendant, are strongly encouraged to follow these controls.

65.     Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any

---

[13] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf.

CONSOLIDATED CLASS ACTION COMPLAINT (Case No. 5:25-cv-04251-PCP)

governance and security initiative, including PCI DSS, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[14]

66.     Several best practices have been identified that a minimum should be implemented by companies like Defendant, including but not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[15]

67.     Defendant failed to follow these and other industry standards to adequately protect the Private Information of Plaintiffs and Class Members.

E.     *Defendant Owed Plaintiffs and Class Members a Common Law Duty to Safeguard their Private Information.*

68.     In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant's duty owed to Plaintiffs and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure its computer systems, networks, and protocols adequately protected Plaintiffs' and Class Members' Private Information.

69.     Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

70.     Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner and act upon data

---

[14] *See CIS Benchmarks FAQ*, Center for Internet Security, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/.
[15] *See* Center for Internet Security, *Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf.

security warnings and alerts in a timely fashion.

71. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

72. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

73. Defendant failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

**F.** ***Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendant's Conduct.***

74. Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

75. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

76. Plaintiffs and Class Members are also at a continued risk because their Private Information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect the Private Information in its systems.

77. As a result of Defendant's delay between the Data Breach in September through November 2024 and the notice of the Data Breach sent to affected persons in May 2025, the risk of fraud for Plaintiffs and Class Members increased exponentially. As a result of Defendant's ineffective and inadequate data security practices, the resulting Data Breach, and the foreseeable consequences of their Private Information ending up in criminals' possession, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and they have all sustained

actual injuries and damages, including, without limitation, (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Defendant; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

### *The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing.*

78.     Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

79.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

80.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

---

[16] 17 C.F.R. § 248.201 (2013).
[17] *Id.*

81.     The dark web is an unindexed layer of the internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

82.     A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information. As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[18]

83.     The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

84.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[18] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited August 14, 2025).

CONSOLIDATED CLASS ACTION COMPLAINT (Case No. 5:25-cv-04251-PCP)

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

85.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

86.     Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[19]

87.     One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[20]

_____

[19] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[20] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),

-17-

88.     With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

89.     The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

90.     Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

91.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

92.     The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs; and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

93.     Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> "A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that

---

https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited August 14, 2025).

CONSOLIDATED CLASS ACTION COMPLAINT (Case No. 5:25-cv-04251-PCP)

were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[21]

94.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

95.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

96.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

97.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

---

[21] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Aug. 14, 2025).

98.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.

99.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

100.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

101.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

102.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

### Diminished Value of Private Information

103.    Personal data like Private Information is a valuable property right.[23] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber

---

[22] See Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited August 14, 2025).

[23] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PRIVATE INFORMATION, which companies obtain

thefts may include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

104.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

105.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the cybercriminals.

106.    However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary*

107.    To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

108.    Given the Breach, the type of information involved, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

109.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected

---

at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

110. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

111. Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

112. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### *Loss of Benefit of the Bargain*

113. Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

114. Plaintiffs and Class Members understood and expected that Defendant maintained adequate data security to protect the Private Information they were required to provide.

115. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

**G. Plaintiffs' Experiences.**

    **a.**    <u>**Plaintiff Nancy Balzer's Experience**</u>

116. Plaintiff Balzer received a notice letter from Defendant dated May 9, 2025, informing her that her Personal Information—including her name, date of birth, medical record number, patient account number, medical/health information, health insurance information,

prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

117. Plaintiff Balzer is very careful about sharing her sensitive information. To the best of Plaintiff's knowledge, she has never before had her Personal Information exposed in any other data breach. Plaintiff Balzer would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

118. Plaintiff Balzer stores any documents containing her Personal Information in a safe and secure location. Plaintiff Balzer has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

119. Because of the Data Breach, Plaintiff Balzer's Personal Information is now in the hands of cybercriminals.

120. Plaintiff Balzer has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

121. As a result of the Data Breach, which exposed highly valuable information such her name, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password, Plaintiff Balzer is now at a present and continuing risk of identity theft and fraud.

122. As a result of the Data Breach, Plaintiff Balzer has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Balzer has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking

other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

123. The letter Plaintiff Balzer received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

124. Plaintiff Balzer fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

125. Plaintiff Balzer has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Balzer's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Balzer's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Balzer's Personal Information; and (e) continued risk to Balzer's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

**b.  Plaintiff Patricia Barclay's Experience**

126. Plaintiff Barclay received a notice letter from Defendant dated May 9, 2025, informing her that her Personal Information—including her name, Social Security number, date of birth, medical record number, patient account number, medical/health information, health

insurance information, prescription/treatment information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

127. Plaintiff Barclay is very careful about sharing her sensitive information. Plaintiff Barclay would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

128. Plaintiff Barclay stores any documents containing her Personal Information in a safe and secure location. Plaintiff Barclay has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

129. Because of the Data Breach, Plaintiff Barclay's Personal Information is now in the hands of cybercriminals.

130. Plaintiff Barclay has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

131. As a result of the Data Breach, which exposed highly valuable information such as her Social Security Number and her Medical/Health Information, Plaintiff Barclay is now at a present and continuing risk of identity theft and fraud.

132. As a result of the Data Breach, Plaintiff Barclay has experienced data misuse and identity theft. For example, shortly after the Data Breach occurred, on October 20,2024, Plaintiff Barclay received a credit monitoring alert informing her that her Social Security Number was associated with a Buffalo, New York address which may not belong to her. Further, on March 21, 2025, Plaintiff Barclay was alerted that a credit account was opened in her name with a $753.00 balance. Plaintiff Barclay has also experienced a notable increase in the number of spam calls she receives since the Data Breach, which she believes are attempts to acquire additional data from her to be used for fraud and identity theft. Plaintiff Barclay attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, and the fact that she is very careful with her Personal Information.

133.    As a result of the Data Breach, Plaintiff Barclay has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Barclay has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

134.    In addition to losing time in an attempt to mitigate the harm from the Data Breach, Plaintiff Barclay feels constant stress from the nonstop spam messages and calls she receives. Some of these calls even go as far as requesting her to provide information in order to provide her father emergency services even though her father has been deceased since 2010. This ongoing emotional trauma and harm as a direct result of her information being compromised as result of the Data Breach.

135.    The letter Plaintiff Barclay received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

136.    Plaintiff Barclay fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

137.    Plaintiff Barclay has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Barclay's valuable Personal Information; (b) the

imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Barclay's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Barclay's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Barclay's Personal Information; and (e) continued risk to Plaintiff Barclay's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### c. Plaintiff Michelle Fix's Experience

138. Plaintiff Fix received a notice letter from Defendant dated May 9, 2025 informing her that her Personal Information—including her name, Social Security number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, provider name, provider location, and email/username and password— was specifically identified as having been exposed to cybercriminals in the Data Breach.

139. Plaintiff Fix is very careful about sharing her sensitive information. To the best of Plaintiff's knowledge, she has never before had her Personal Information exposed in any other data breach. Plaintiff Fix would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

140. Plaintiff Fix stores any documents containing her Personal Information in a safe and secure location. Plaintiff Fix has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

141. Because of the Data Breach, Plaintiff Fix's Personal Information is now in the hands of cybercriminals.

142.    Plaintiff Fix has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

143.    As a result of the Data Breach, which exposed highly valuable information, such as her medical/health information, Plaintiff Fix is now at a present and continuing risk of identity theft and fraud.

144.    As a result of the Data Breach, Plaintiff Fix has experienced data misuse and identity theft. For example, in April 2025, since the Data Breach, Plaintiff Fix experienced multiple charges on her debit cards. Plaintiff Fix has also experienced a notable increase in the number of spam calls she receives since the Data Breach which she believes are attempts to acquire additional data from her to be used for fraud and identity theft. Plaintiff Fix attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that she is very careful with her Personal Information, and the fact that she has never experienced anything like this prior to now.

145.    As a result of the Data Breach, Plaintiff Fix has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Fix has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

146.    The letter Plaintiff Fix received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for

suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

147.  Plaintiff Fix fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

148.  Plaintiff Fix has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Fix's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Fix's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Fix's Personal Information; and (e) continued risk to Plaintiff Fix's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### d.  Plaintiff Jason Gordon's Experience

149.  Plaintiff Gordon received a notice letter from Defendant dated May 9, 2025, informing him that his Personal Information—including his name, Social Security number, Date of Birth, Medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

150.  Plaintiff Gordon is very careful about sharing his sensitive information. To the best of Plaintiff's knowledge, he has never before had his Personal Information exposed in any other

data breach. Plaintiff Gordon would not have allowed Defendant to collect his Personal Information had he known the true state of affairs regarding Defendant's data security practices.

151. Plaintiff Gordon stores any documents containing his Personal Information in a safe and secure location. Plaintiff Gordon has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

152. Because of the Data Breach, Plaintiff Gordon's Personal Information is now in the hands of cybercriminals.

153. Plaintiff Gordon has suffered actual injury from the exposure and theft of his Personal Information—including violation of his right to privacy.

154. As a result of the Data Breach, which exposed highly valuable information such as his name, Social Security number, Date of Birth, Medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password. Plaintiff Gordon is now at a present and continuing risk of identity theft and fraud.

155. As a result of the Data Breach, Plaintiff Gordon has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff Gordon has had a name added to his credit report (Jason R. Gordon), which is not him. Further, Plaintiff Gordon's credit score had dropped dramatically and after reviewing his credit report, his personal information has been confirmed to be on the market/dark web. Plaintiff Gordon has also experienced a notable increase in the number of spam calls he receives since the Data Breach which he believes are attempts to acquire additional data from him to be used for fraud and identity theft. Plaintiff Gordon attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that he is very careful with his Personal Information, and the fact that he has never experienced anything like this prior to now.

156. As a result of the Data Breach, Plaintiff Gordon has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Gordon has already expended

time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

157.    The letter Plaintiff Gordon received from Defendant specifically directed him to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

158.    Plaintiff Gordon fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

159.    Plaintiff Gordon has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Gordon's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Gordon's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Gordon's Personal Information; and (e) continued risk to Plaintiff Gordon's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

**e.  Plaintiff Michael Gurr Experience**

160.    Plaintiff Gurr received a notice letter from Defendant dated May 9, 2025, informing him that his Personal Information—including his name, Social Security number, Date of Birth, Medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

161.    Plaintiff Gurr is very careful about sharing his sensitive information. To the best of Plaintiff's knowledge, he has never before had his Personal Information exposed in any other data breach. Plaintiff Gurr would not have allowed Defendant to collect his Personal Information had he known the true state of affairs regarding Defendant's data security practices.

162.    Plaintiff Gurr stores any documents containing his Personal Information in a safe and secure location. Plaintiff Gurr has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

163.    Because of the Data Breach, Plaintiff Gurr's Personal Information is now in the hands of cybercriminals.

164.    Plaintiff Gurr has suffered actual injury from the exposure and theft of his Personal Information—including violation of his right to privacy.

165.    As a result of the Data Breach, which exposed highly valuable information such as his name, Social Security number, Date of Birth, Medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password. Plaintiff Gurr is now at a present and continuing risk of identity theft and fraud.

166.    As a result of the Data Breach, Plaintiff Gurr has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff Gurr was notified by the service he now pays for, Cloaked, that his information was on the dark web. Plaintiff Gurr has also experienced a notable increase in the number of spam calls he receives since the Data Breach

which he believes are attempts to acquire additional data from him to be used for fraud and identity theft. The most concerning calls are from loan companies that are requesting his final approval for the loan(s) that were requested, although Plaintiff Gurr has not applied for any such loans. Plaintiff Gurr attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that he is very careful with his Personal Information, and the fact that he has never experienced anything like this prior to now.

167.    As a result of the Data Breach, Plaintiff Gurr has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Gurr has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, changing password, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

168.    The letter Plaintiff Gurr received from Defendant specifically directed him to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

169.    Plaintiff Gurr fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

170.    Plaintiff Gurr has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Gurr's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value

of Plaintiff Gurr's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Gurr's Personal Information; and (e) continued risk to Plaintiff Gurr's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### f. Plaintiff David A. Hoover's Experience

171. Plaintiff Hoover received a notice letter from Defendant dated May 9, 2025, informing him that his Personal Information—including his name, Social Security number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

172. Plaintiff Hoover is very careful about sharing his sensitive information. Plaintiff Hoover would not have allowed Defendant to collect his Personal Information had he known the true state of affairs regarding Defendant's data security practices.

173. Plaintiff Hoover stores any documents containing his Personal Information in a safe and secure location. Plaintiff Hoover has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

174. Because of the Data Breach, Plaintiff Hoover's Personal Information is now in the hands of cybercriminals.

175. Plaintiff Hoover has suffered actual injury from the exposure and theft of is Personal Information—including violation of his right to privacy.

176. As a result of the Data Breach, which exposed highly valuable information such his name, Social Security number, date of birth, medical record number, patient account number,

medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password, Plaintiff Hoover is now at a present and continuing risk of identity theft and fraud.

177. As a result of the Data Breach, Plaintiff Hoover has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Hoover has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

178. The letter Plaintiff Hoover received from Defendant specifically directed him to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

179. Plaintiff Hoover fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

180. Plaintiff Hoover has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Hoover's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Hoover's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in

value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Hoover's Personal Information; and (e) continued risk to Plaintiff Hoover's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### g. Plaintiff Shawnte Monique McDowell's Experience

181. Plaintiff McDowell received a notice letter from Defendant dated May 9, 2025, informing her that her Personal Information—including her name, Social Security number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

182. Plaintiff McDowell is very careful about sharing her sensitive information. Plaintiff McDowell would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

183. Plaintiff McDowell stores any documents containing her Personal Information in a safe and secure location. Plaintiff McDowell has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

184. Because of the Data Breach, Plaintiff McDowell's Personal Information is now in the hands of cybercriminals.

185. Plaintiff McDowell has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

186. As a result of the Data Breach, which exposed highly valuable information such as her name, Social Security number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information,

clinical information, provider name, provider location, and email/username and password, Plaintiff McDowell is now at a present and continuing risk of identity theft and fraud.

187. As a result of the Data Breach, Plaintiff McDowell has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff McDowell had a fraudulent charge placed on her account from an off-track betting site, she does not gamble using illegal websites. Plaintiff McDowell has also experienced a notable increase in the number of spam calls she receives since the Data Breach which she believes are attempts to acquire additional data from her to be used for fraud and identity theft. Plaintiff McDowell attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, and the fact that she is very careful with his Personal Information.

188. As a result of the Data Breach, Plaintiff McDowell has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff McDowell has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

189. The letter Plaintiff McDowell received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

190.     Plaintiff McDowell fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

191.     Plaintiff McDowell has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff McDowell's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff McDowell's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff McDowell's Personal Information; and (e) continued risk to Plaintiff McDowell's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### h.     Plaintiff Donna M. Orlando-Martin's Experience

192.     Plaintiff Orlando-Martin received a notice letter from Defendant dated May 9, 2025, informing her that her Personal Information—including her name, Social Security Number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

193.     Plaintiff Orlando-Martin is very careful about sharing her sensitive information. Plaintiff Orlando-Martin would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

194. Plaintiff Orlando-Martin stores any documents containing her Personal Information in a safe and secure location. Plaintiff Orlando-Martin has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

195. Because of the Data Breach, Plaintiff Orlando-Martin Personal Information is now in the hands of cybercriminals.

196. Plaintiff Orlando-Martin has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

197. As a result of the Data Breach, which exposed highly valuable information such as her name, Social Security Number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password, Plaintiff Orlando-Martin is now at a present and continuing risk of identity theft and fraud.

198. As a result of the Data Breach, Plaintiff Orlando-Martin has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Orlando-Martin has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

199. The letter Plaintiff Orlando-Martin received from Defendant specifically directed [him/her] to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised

victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

200. Plaintiff Orlando-Martin fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

201. Plaintiff Orlando-Martin has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Orlando-Martin's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Orlando-Martin's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Orlando-Martin's Personal Information; and (e) continued risk to Plaintiff Orlando-Martin's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### i. Plaintiff Dawn Pendrak's Experience

202. Plaintiff Pendrak received a notice letter from Defendant dated May 9, 2025, informing her that her Personal Information—including her name, Social Security number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

203. Plaintiff Pendrak is very careful about sharing her sensitive information. Plaintiff Pendrak would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

204.    Plaintiff Pendrak stores any documents containing her Personal Information in a safe and secure location. Plaintiff Pendrak has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

205.    Because of the Data Breach, Plaintiff Pendrak's Personal Information is now in the hands of cybercriminals.

206.    Plaintiff Pendrak has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

207.    As a result of the Data Breach, which exposed highly valuable information such as her Social Security Number and her Medical/Health Information, Plaintiff Pendrak is now at a present and continuing risk of identity theft and fraud.

208.    As a result of the Data Breach, Plaintiff Pendrak has experienced data misuse and identity theft. For example, shortly after the Data Breach occurred, Pendrak had fraudulent charges on her payment card, which required the card to be reissued and time spent to remove the fraudulent charges. Plaintiff Pendrak has also experienced a notable increase in the number of spam calls she receives since the Data Breach, which she believes are attempts to acquire additional data from her to be used for fraud and identity theft. Plaintiff Pendrak attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, and the fact that she is very careful with her Personal Information.

209.    As a result of the Data Breach, Plaintiff Pendrak has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Pendrak has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password information, changing her phone number and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

210. The letter Plaintiff Barclay received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

211. Plaintiff Pendrak fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

212. Plaintiff Pendrak has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Pendrak's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Pendrak's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Pendrak's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Pendrak's Personal Information; and (e) continued risk to Plaintiff Pendrak's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### j. Plaintiff Grace Shrek's Experience

213. Plaintiff Sherk received a notice letter from Defendant dated May 18, 2025, informing her that her Personal Information—including her name, Social Security number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, provider name, provider location, and

email/username and password— was specifically identified as having been exposed to cybercriminals in the Data Breach.

214. Plaintiff Sherk is very careful about sharing her sensitive information. Plaintiff Sherk would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

215. Plaintiff Sherk stores any documents containing her Personal Information in a safe and secure location. Plaintiff Sherk has never knowingly transmitted unencrypted sensitive Personal Information over the internet or any other unsecured source.

216. Because of the Data Breach, Plaintiff Sherk's Personal Information is now in the hands of cybercriminals.

217. Plaintiff Sherk has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

218. As a result of the Data Breach, which exposed highly valuable information, Plaintiff Sherk is now at a present and continuing risk of identity theft and fraud.

219. As a result of the Data Breach, Plaintiff Sherk has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff Sherk has experienced numerous attempts at someone trying to open a line of credit in her name in Cincinnati, where she has never lived. A specific bank in Cincinnati has reached out to her numerous times regarding an account in her name she did not open. Additionally, since the Data Breach, Plaintiff Sherk has been notified of fraudulent charges on her financial account. Plaintiff Sherk has also experienced a notable increase in the number of spam calls she receives since the Data Breach which she believes are attempts to acquire additional data from her to be used for fraud and identity theft. Plaintiff Sherk attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that he is very careful with her Personal Information.

220. As a result of the Data Breach, Plaintiff Sherk has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Sherk has already expended time

and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

221.    The letter Plaintiff Sherk received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

222.    Plaintiff Sherk fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

223.    Plaintiff Sherk has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Sherk's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Sherk's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Sherk's Personal Information; and (e) continued risk to Plaintiff Sherk's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### k. Plaintiff Chloe Wright's Experience

224. Plaintiff Wright received a notice letter from Defendant dated May 9, 2025, informing her that her Personal Information—including her name, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

225. Plaintiff Wright is very careful about sharing her sensitive information. To the best of Plaintiff's knowledge, she has never before had her Personal Information exposed in any other data breach. Plaintiff Wright would not have allowed Defendant to collect her Personal Information had she known the true state of affairs regarding Defendant's data security practices.

226. Plaintiff Wright stores any documents containing her Personal Information in a safe and secure location. Plaintiff Wright has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

227. Because of the Data Breach, Plaintiff Wright's Personal Information is now in the hands of cybercriminals.

228. Plaintiff Wright has suffered actual injury from the exposure and theft of her Personal Information—including violation of her right to privacy.

229. As a result of the Data Breach, which exposed highly valuable information such as her name, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password, Plaintiff Wright is now at a present and continuing risk of identity theft and fraud.

230. As a result of the Data Breach, Plaintiff Wright has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Wright has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate,

mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

231.    The letter Plaintiff Wright received from Defendant specifically directed her to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

232.    Plaintiff Wright fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

233.    Plaintiff Wright has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Wright's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Wright's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Wright's Personal Information; and (e) continued risk to Plaintiff Wright's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

**l.  Plaintiff Roy Everett Yax's Experience**

234.  Plaintiff Yax received a notice letter from Defendant dated May 9, 2025 informing him that his Personal Information—including his name, Social Security Number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach.

235.  Plaintiff Yax is very careful about sharing his sensitive information. To the best of Plaintiff's knowledge, he has never before had his Personal Information exposed in any other data breach. Plaintiff Yax would not have allowed Defendant to collect his Personal Information had he known the true state of affairs regarding Defendant's data security practices.

236.  Plaintiff Yax stores any documents containing his Personal Information in a safe and secure location. Plaintiff Yax has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

237.  Because of the Data Breach, Plaintiff Yax's Personal Information is now in the hands of cybercriminals.

238.  Plaintiff Yax has suffered actual injury from the exposure and theft of his Personal Information—including violation of his right to privacy.

239.  As a result of the Data Breach, which exposed highly valuable information such as his name, Social Security Number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password, Plaintiff Yax is now at a present and continuing risk of identity theft and fraud.

240.  As a result of the Data Breach, Plaintiff Yax has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Yax has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate,

and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

241.    The letter Plaintiff Yax received from Defendant specifically directed [him/her] to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

242.    Plaintiff Yax fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

Plaintiff Yax has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Yax's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Yax's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Yax's Personal Information; and (e) continued risk to Plaintiff Yax's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them.

### m. Plaintiff Lee Holdsworth's Experience

243. Plaintiff Holdsworth received a notice letter from Defendant dated May 9, 2025 informing him that the Personal Information of his minor child—including his name, Social Security Number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password—was specifically identified as having been exposed to cybercriminals in the Data Breach. Plaintiff Holdsworth's child is a patient of Catholic Health.

244. Plaintiff Holdsworth is very careful about sharing his sensitive information for himself and his minor child. To the best of Plaintiff's knowledge, he has never before had his Personal Information exposed in any other data breach. Plaintiff Holdsworth would not have allowed Defendant to collect his child's Personal Information had he known the true state of affairs regarding Defendant's data security practices.

245. Plaintiff Holdsworth stores any documents containing his child's Personal Information in a safe and secure location. Plaintiff Holdsworth has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

246. Because of the Data Breach, the Plaintiff Holdsworth's minor child's Personal Information is now in the hands of cybercriminals.

247. Plaintiff Holdsworth's minor child has suffered actual injury from the exposure and theft of his Personal Information—including violation of his right to privacy.

248. As a result of the Data Breach, which exposed highly valuable information such as his name, Social Security Number, date of birth, medical record number, patient account number, medical/health information, health insurance information, prescription/treatment information, clinical information, provider name, provider location, and email/username and password, Plaintiff Holdsworth is now at a present and continuing risk of identity theft and fraud.

249. As a result of the Data Breach, Plaintiff Holdsworth, on behalf of his minor child, has had no choice but to spend numerous hours attempting to mitigate the harms caused by the

Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Holdsworth has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

250. The letter Plaintiff Holdsworth received from Defendant specifically directed him to take the actions described above. Indeed, the Breach Notice letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the Breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Breach Notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

251. Plaintiff Holdsworth fears that criminals will use his child's information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

Plaintiff Holdsworth's child has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of his child's valuable Personal Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by his child's Personal Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Holdsworth's child's Personal Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Holdsworth's child's Personal Information; and (e) continued risk to Plaintiff

Holdsworth's child's Personal Information, which remains in the possession of Defendant and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Personal Information that was entrusted to them

## CLASS ALLEGATIONS

252.    Plaintiffs bring this class action individually and, pursuant to Federal Rule of Civil Procedure Rule 23, on behalf of:

> All United States citizens whose Private Information was compromised in the Data Breach discovered by Defendant in November 2024, including all those who received notice of the breach.

253.    Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendant has a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

254.    Plaintiffs reserve the right to modify or amend the foregoing Class definition before the Court determines whether certification is appropriate.

255.    <u>Numerosity:</u> The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. The precise number of individuals affected is believed to be several thousands of individuals.

256.    <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

      a.    Whether Defendant engaged in the conduct alleged herein;

      b.    Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure;

      c.    Whether Defendant's computer systems and data security practices used to protect Plaintiffs' and Class Members' Private Information violated federal and/or state laws, and/or Defendant's other duties discussed herein;

d. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and Class Members;

e. Whether Defendant unlawfully shared, lost, or disclosed Plaintiffs' and Class Members' Private Information;

f. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

i. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' Private Information;

j. Whether Defendant breached duties to protect Plaintiffs' and Class Members' Private Information;

k. Whether Defendant's actions and inactions alleged herein were negligent;

l. Whether Defendant was unjustly enriched by its conduct as alleged herein;

m. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

n. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

o. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

257. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

258. <u>Typicality:</u> Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their Private Information compromised in the Data Breach. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

259. <u>Adequacy:</u> Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Class and have no interests adverse to, or conflict with, the Class she seeks to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

260. <u>Superiority:</u> A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

261. <u>Injunctive and Declaratory Relief:</u> Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

262. All members of the proposed Class are readily ascertainable. Defendant has access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach. Indeed, impacted Class Members already have been preliminarily identified and sent a Breach Notice letter.

**FIRST CLAIM FOR RELIEF**
**Negligence**
**(On behalf of the Nationwide Class)**

263. Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

264. At all times herein relevant, Defendant owed Representative Plaintiffs and Class Members a duty of care, *inter alia*, to act with reasonable care to secure and safeguard their Private Information and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing Representative Plaintiffs' and Class Members' Private Information on its computer systems.

265. Among these duties, Defendant was expected:

    a. to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Private Information in its possession;

    b. to protect Representative Plaintiffs' and Class Members' Private Information using reasonable and adequate security procedures and systems that were/are compliant with industry-standard practices;

    c. to implement processes to quickly detect the Data Breach and to timely act on warnings about data breaches; and

    d. to promptly notify Representative Plaintiffs and Class Members of any data breach, security incident or intrusion that affected or may have affected their Private Information.

266. Defendant knew that the Private Information was private and confidential and should be protected as private and confidential and, thus, Defendant owed a duty of care not to subject Representative Plaintiffs and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

267. Defendant knew or should have known of the risks inherent in collecting and storing Private Information, the vulnerabilities of its data security systems and the importance of adequate security. Defendant knew about numerous, well-publicized data breaches.

268. Defendant knew or should have known that its data systems and networks did not adequately safeguard Representative Plaintiffs' and Class Members' Private Information.

269. Only Defendant was in the position to ensure that its systems and protocols were sufficient to protect the Private Information that Representative Plaintiffs and Class Members had entrusted to it.

270. Defendant breached its duties to Representative Plaintiffs and Class Members by failing to provide fair, reasonable or adequate computer systems and data security practices to safeguard Representative Plaintiffs' and Class Members' Private Information.

271. Because Defendant knew that a breach of its systems could damage thousands of individuals, including Representative Plaintiffs and Class Members, Defendant had a duty to adequately protect its data systems and the Private Information contained thereon.

272. Representative Plaintiffs' and Class Members' willingness to entrust Defendant with its Private Information was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems and the Private Information it stored on them from attack. Thus, Defendant had a special relationship with Representative Plaintiffs and Class Members.

273. Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Representative Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach. These "independent duties" are untethered to any contract between Defendant and Representative Plaintiffs and/or the remaining Class Members.

274. Defendant breached its general duty of care to Representative Plaintiffs and Class Members in, but not necessarily limited to, the following ways:

  a. by failing to provide fair, reasonable or adequate computer systems and data security practices to safeguard Representative Plaintiffs' and Class Members' Private Information;

  b. by failing to timely and accurately disclose that Representative Plaintiffs' and Class Members' Private Information had been improperly acquired or accessed;

  c. by failing to adequately protect and safeguard the Private Information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information;

  d. by failing to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather Representative Plaintiffs' and Class Members' Private Information, misuse the Private Information and intentionally disclose it to others without consent;

e.    by failing to adequately train its employees to not store Private Information longer than absolutely necessary;

f.    by failing to consistently enforce security policies aimed at protecting Representative Plaintiffs' and the Class Members' Private Information;

g.    by failing to implement processes to quickly detect data breaches, security incidents or intrusions; and

h.    by failing to encrypt Representative Plaintiffs' and Class Members' Private Information and monitor user behavior and activity in order to identify possible threats.

275.    Defendant's willful failure to abide by these duties was wrongful, reckless and/or grossly negligent in light of the foreseeable risks and known threats.

276.    As a proximate and foreseeable result of Defendant's grossly negligent conduct, Representative Plaintiffs and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

277.    The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the Private Information to Representative Plaintiffs and Class Members so that they could and/or still can take appropriate measures to mitigate damages, protect against adverse consequences and thwart future misuse of their Private Information.

278.    Defendant breached its duty to notify Representative Plaintiffs and Class Members of the unauthorized access by waiting excessively after learning of the Data Breach to notify Representative Plaintiffs and Class Members and then by failing and continuing to fail to provide Representative Plaintiffs and Class Members sufficient information regarding the breach. To date, Defendant has not provided sufficient information to Representative Plaintiffs and Class Members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Representative Plaintiffs and Class Members.

279.    Further, through its failure to provide timely and clear notification of the Data Breach to Representative Plaintiffs and Class Members, Defendant prevented Representative Plaintiffs and Class Members from taking meaningful, proactive steps to, *inter alia*, secure and/or access their Private Information.

280. There is a close causal connection between Defendant's failure to implement security measures to protect Representative Plaintiffs' and Class Members' Private Information and the harm suffered, or risk of imminent harm suffered, by Representative Plaintiffs and Class Members. Representative Plaintiffs' and Class Members' Private Information was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing and maintaining appropriate security measures.

281. Defendant's wrongful actions, inactions and omissions constituted (and continue to constitute) common law negligence.

282. The damages Representative Plaintiffs and Class Members have suffered (as alleged above) and will continue to suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

283. Additionally, 15 U.S.C. § 45 (FTC Act, Section 5) prohibits "unfair […] practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

284. Defendant violated 15 U.S.C. § 45 by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Representative Plaintiffs and Class Members.

285. As a direct and proximate result of Defendant's negligence, Representative Plaintiffs and Class Members have suffered and will continue to suffer injury, including, but not limited to, (i) actual identity theft, (ii) the loss of the opportunity of how their Private Information is used, (iii) the compromise, publication and/or theft of their Private Information, (iv) out-of-pocket expenses associated with the prevention, detection and recovery from identity theft, tax fraud and/or unauthorized use of their Private Information, (v) lost opportunity costs associated

with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from embarrassment and identity theft, (vi) lost continuity in relation to their personal records, (vii) the continued risk to their Private Information, which may remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Representative Plaintiffs' and Class Members' Private Information in its continued possession, and (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Representative Plaintiffs and Class Members.

286. As a direct and proximate result of Defendant's negligence, Representative Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy and other economic and noneconomic losses.

287. Additionally, as a direct and proximate result of Defendant's negligence, Representative Plaintiffs and Class Members have suffered and will continue to suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession.

288. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

289. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND CLAIM FOR RELIEF
### Breach of Implied Contract
### (On behalf of the Nationwide Class)

290. Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth herein.

291. Defendant entered into various contracts with its clients, including Catholic Health, to provide services to its clients.

292. On information and belief, these contracts are virtually identical to each other and were made expressly for the benefit of Plaintiffs and the Class, as it was their confidential information that Defendant agreed to collect and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class were the direct and primary objective of the contracting parties.

293. Defendant knew that if it were to breach these contracts with its clients, the clients' consumers, including Plaintiffs and the Class, would be harmed by, among other things, fraudulent misuse of their Private Information.

294. Defendant breached its contracts with its clients when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiffs' and Class Members' Private Information.

295. As a reasonably foreseeable result of the breach, Plaintiffs and the Class were harmed by Defendant's failure to use reasonable data security measures to store their Private Information, including but not limited to, the actual harm through the loss of their Private Information to cybercriminals.

296. As a direct and proximate result of the breach of the contractual duties, Plaintiffs and Class Members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiffs and the Class Members include: (a) the invasion of privacy; (b) the compromise, disclosure, theft, and unauthorized use of their Private Information; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d) monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including

time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the theft and compromise of their Private Information; (g) the diminution in the value of the services bargained for as Plaintiffs and Class Members were deprived of the data protection and security that Defendant promised when Plaintiffs and the proposed class entrusted Defendant with their Private Information; and (h) the continued and substantial risk to Plaintiffs' and Class Members' Private Information, which remains in the Defendant's possession with inadequate measures to protect Plaintiffs' and Class Members' Private Information.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On behalf of the Nationwide Class)**

297. Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

298. This claim is pleaded in the alternative to the breach of implied contractual duty claim.

299. Plaintiffs and members of the Class conferred a benefit upon Defendant in providing Private Information to Defendant.

300. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and the Class. Defendant also benefited from the receipt of Plaintiffs' and the Class's Private Information, as this was used to facilitate the treatment, services, and goods they sold to Plaintiffs and the Class.

301. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the Class's Private Information because Defendant failed to adequately protect their Private Information. Plaintiffs and the proposed Class would not have provided their Private Information to Defendant, through Catholic Health, had they known Defendant would not adequately protect their Private Information.

302. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and Data Breach.

**FOURTH CLAIM FOR RELIEF**
**Invasion of Privacy**
**(On behalf of the Nationwide Class)**

274. Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

275. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

276. Defendant owed a duty, including Plaintiffs and the Class, to keep this information confidential.

277. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' Private Information is highly offensive to a reasonable person.

278. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

279. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

280. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

281. Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

282.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

283.    Indeed, the definition of intent is met here under Section 8A of the Restatement (Second) of Torts because, given the ubiquity of cyberattacks and Defendant's collection of PHI and PII, it was substantially certain that a failure to invest appropriate resources into its cybersecurity program—including investments into policy and practice creation to avoid its own inadvertent disclosures—would lead to a breach of PII and PHI.

284.    As a proximate result of Defendant's acts and omissions, the sensitive Private Information of Plaintiffs and the Class were made available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

285.    And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

286.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information are still maintained by Defendant with their inadequate cybersecurity system and policies.

287.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiffs and the Class.

288.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FIFTH CLAIM FOR RELIEF**
**California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On behalf of the Nationwide Class)**

288.　Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein

289.　Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

290.　Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq*. (the "CCPA"), the California Customer Records Act, Cal. Civ. Code § 1798.80, *et seq*. (the "CRA"), and other state data security laws.

291.　Defendant stored the Private Information of Plaintiffs and the Class in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiffs' and the Class's Private Information secure to prevent the loss or misuse of that Private Information.

292.　Defendant failed to disclose to Plaintiffs and the Class that their Private Information was not secure. However, Plaintiffs and the Class were entitled to assume, and did assume, that Defendant had secured their Private Information. At no time were Plaintiffs and the Class on notice that their Private Information was not secure, which Defendant had a duty to disclose.

293.　Defendant also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and the Class's nonencrypted and nonredacted PII/PHI.

294.　Had Defendant complied with these requirements, Plaintiffs and the Class would not have suffered the damages related to the data breach.

295. Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

296. Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

297. Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting Private Information.

298. Defendant also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

299. Instead, Defendant made the Private Information of Plaintiffs and the Class accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiffs and the Class to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

300. As a result of those unlawful and unfair business practices, Plaintiffs and the Class suffered an injury-in-fact and have lost money or property.

301. For one, on information and belief, Plaintiffs' and the Class's stolen Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

302.     The injuries to Plaintiffs and the Class greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

303.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

304.     Therefore, Plaintiffs and the Class are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

## SIXTH CLAIM FOR RELIEF
### Declaratory Judgment
### (On behalf of the Nationwide Class)

305.     Each and every allegation of the preceding paragraphs is incorporated in this Count with the same force and effect as though fully set forth therein.

306.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

307.     In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendant's actions were—and still are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

308.     Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.   Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to them;

   b.    Defendant have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, their duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant's breach of their duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

309. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

310. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

311. And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

312. If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

313. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the class, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, nominal damages and disgorgement;

C. Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of herself and the class, seek appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and

implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury of all claims herein so triable.


Dated: August 21, 2025

By:  */s/ Andrew G. Gunem*
Andrew G. Gunem (SBN: 354042)
Raina C. Borrelli (*Pro Hac Vice*)
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
agunem@straussborrelli.com
raina@straussborrelli.com

Jeff Ostrow (*Pro Hac Vice*)
Kristen Lake Cardoso (CA Bar No. 338762)
**KOPELOWITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
T: (954) 525-4100
cardoso@kolawyers.com
ostrow@kolawyers.com

Daniel Srourian, Esq. (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr., Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Fax: (213) 471-4160

-67-
CONSOLIDATED CLASS ACTION COMPLAINT (Case No. 5:25-cv-04251-PCP)

Email: daniel@slfla.com

Scott Edward Cole, Esq. (S.B. #160744)
Laura Grace Van Note, Esq. (S.B. #310160)
Mark T. Freeman, Esq. (S.B. #293721)
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
T: (510) 891-9800
F: (510) 891-7030
sec@colevannote.com
lvn@colevannote.com
mtf@colevannote.com

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**
402 W Broadway, Suite 1760
San Diego, CA 92101
Tel.: (858) 209-6941
jnelson@milberg.com

Reuben A. Aguirre (SBN 319699)
Danielle Perry (SBN 292120)
**MASON LLP**
5335 Wisconsin Avenue NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
raguirre@masonllp.com
dperry@masonllp.com

Neil Williams*
Catherine Ybarra (SBN 283360)
Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500,
New York, NY 10151
T: (929) 474-6448
cybarra@sirillp.com
tbean@sirillp.com
nwilliams@sirillp.com

John P. Kristensen (SBN 224132)
**KRISTENSEN LAW GROUP**
120 Santa Barbara St., Suite C9
Santa Barbara, California 93101

T: (805) 837-2000
john@kristensen.law

Leigh S. Montgomery*
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
T: (888) 350-3931
lmontgomery@eksm.com
service@eksm.com

Daniel Srourian, Esq. (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr., Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Fax: (213) 471-4160
Email: daniel@slfla.com

Mark S. Reich*
Melissa G. Meyer*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
T: (212) 363-7500
F: (212) 363-7171
mreich@zlk.com
mmeyer@zlk.com

J. Gerard Stranch, IV*
Grayson Wells*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
T: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

John C. Bohren (California Bar No. 295292)
**YANNI LAW APC**
P.O. Box 12174
San Diego, CA 92112
Telephone: (619) 433-2803
Fax: (800) 867-6779
yanni@bohrenlaw.com

Paul J. Doolittle, Esq.*
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

*Attorneys for Representative Plaintiffs and the
Proposed Class*